## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT A. BAUTISTA, | : | |
| | : | |
| Petitioner | : | |
| v. | : | CIVIL ACTION NO. 3:12-cv-0596 |
| | : | |
| | : | (Judge Caputo) |
| MARY E. SABOL, et al., | : | |
| | : | |
| Respondents. | : | |

## MEMORANDUM

Presently before the Court is Petitioner Robert A. Bautista's Emergency Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241(c)(3).  Bautista, formerly a Lawful Permanent Resident of the United States, was taken into custody by U.S. Immigration and Customs Enforcement ("ICE") following his return from a trip abroad.  While ICE contends that  Bautista was convicted of an aggravated felony years earlier, this conviction had not been raised by ICE until Bautista's encounter with the customs agent at the airport.  Today, Bautista has been detained by ICE for approximately twenty-six months while the merits of his case are on appeal before the Third Circuit Court of Appeals.  Because their period of detention falls within the category of "prolonged, unreasonable, detention without a bond hearing" the Circuit Court cautioned against in *Diop v. ICE/Homeland Security*, 656 F.3d 221, 235 (3d Cir. 2011), Bautista's Petition will be granted insofar as he seeks an individualized bond hearing.

## BACKGROUND

Petitioner Robert A. Bautista puts forth the following in his Petition.  Bautista  was born in the Dominican Republic on August 11, 1974, but was admitted to the United States as a

Lawful Permanent Resident in 1984.  He has three young children and his wife, Yenny Bautista, is a Lawful Permanent Resident.  Together, they lived in Easton, Pennsylvania where they started a successful transmission repair business.  In 2003, the Supreme Court of New York convicted Bautista of Attempted Arson in the Third Degree.  This conviction was based on Bautista being discovered next to his own vehicle with a gas tank in his hand.  He was sentenced to five years probation which he successfully completed, although he is currently challenging this conviction.  Prior to that, Bautista pleaded guilty to a violation of the "forged writing" provision of New Jersey's criminal code for possession of a fake identification. For that, Bautista was sentenced to, and successfully completed, a one-year probation term. Aside from those two incidents, Bautista has been a law-abiding, productive member of society.  However, since his detention, his previously lucrative business has gone into bankruptcy and his family has lost their home, which was nearly paid off.

In 2009, Bautista made two trips back to the Dominican Republic.  On the first trip, he easily reentered the United States with his Permanent Resident Card.  Upon return from the second trip, he was detained at John F. Kennedy airport.  Although he was ultimately permitted to enter, he was instructed to make contact with the Philadelphia Customs and Border Patrol Office for a deferred inspection.  Eventually, Bautista was told to report to the Philadelphia Customs and Border Patrol Office on March 25, 2010.  Bautista was informed that he had nothing to worry about.  However, at that inspection, Bautista was entered into mandatory immigration detention and has been there ever since.  He was first taken to Lackawanna County Prison in Scranton, Pennsylvania, but was transferred to the York County Correctional Facility in York, Pennsylvania, where he remains today.

On April 8, 2010, Bautista appeared before Judge Walter Durling of the York

Immigration Court where he entered a plea after his motions to terminate were denied. The United States charged Bautista as inadmissible, and Bautista sought to cancel his removal pursuant to 8 U.S.C. § 1229b(a). On February 8, 2011, Judge Durling determined that Bautista, having "already been convicted of an aggravated felony," was not eligible for cancellation of removal and ordered him removed from the United States. (Resp'ts' Ex. 3 at 2.) Bautista appealed this decision to the Board of Immigration Appeals, which, after argument, dismissed the appeal on October 13, 2011. (Resp'ts' Ex. 4.) Bautista has petitioned the Third Circuit Court of Appeals for further review of this determination, which is currently pending.

Judge Munley dismissed Bautista's previous Emergency Petition for a Writ of Habeas Corpus, determining that because he had not sought parole, Bautista had failed to properly exhaust with respect to his constitutional claims. *Bautista v. Sabol*, No. 3:11cv1611, 2011 WL 5040894, at *3-4 (M.D. Pa. Oct. 24, 2011). Subsequent to that Memorandum, on November 1, 2011, Bautista sought parole under 8 C.F.R. 235.3(c), which was denied in a January 24, 2012 letter.[1] (Pet'r's Exs. B, C, & D.) In the present Motion, there is no argument that Bautista has not exhausted his administrative remedies as required by 8 U.S.C. § 1252(d)(1).

At the date of the instant Petition, Bautista had been in DHS custody for over twenty-four months. Bautista now brings this Habeas Motion pursuant to 28 U.S.C. § 2241 seeking an immediate release and an individualized bond hearing. The Respondents to the instant

---

[1] In his second letter requesting parole, Bautista proposed that he would: (1) execute a $25,000 bond; (2) not be allowed to leave the Commonwealth of Pennsylvania; (3) wear a monitoring device; and (4) place daily calls to and make weekly appearances at the Philadelphia Detention & Removal Office–as well as any other conditions deemed appropriate. (Pet'r's Ex. C at 4.)

Petition include: (1) Mary E. Sabol, the Warden of the York County Correctional Facility; (2) the Department of Homeland Security ("DHS"); (3) Immigration and Customs Enforcement ("ICE"), the investigatory branch of the DHS; (4) Janet Napolitano, the Secretary of the Department of Homeland Security; (5) Thomas Decker, the Philadelphia Director for ICE; (6) David Clark, the director of ICE Detention Operations who oversees Petitioner's detention; and (7) John Morton, a Deputy Secretary of DHS who leads ICE.  Although Bautista failed to submit a reply brief in support of his position, this matter is now ripe for the Court's review.

## **DISCUSSION**

Generally, "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."  8 U.S.C. § 1231(a)(1)(A). Throughout this so-called removal period, "the Attorney General *shall* detain the alien."  *Id.* at § 1231 (a)(2) (emphasis added).  Where, as here, the administrative removal order is judicially reviewed, the removal period begins to run with the "date of the court's final order." *Id.* at § 1231(a)(1)(B)(ii). Furthermore, § 1231(a)(6)[2] allows an alien who, among other things, has been convicted of an aggravated felony, to be detained for a removal period greater than 90-days.  This does not allow for indefinite detention, however, and the Supreme Court has recognized a six-month period as presumptively reasonable.  *Zadvydas v. Davis*, 533 U.S. 678, 701  (2001).  At the conclusion of this 6-month period, "once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably

---

[2]  In pertinent part, 8 U.S.C. § 1231(a)(6) provides that: "An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period . . . ."

foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* The Supreme Court has since expanded this six-month rule to cover aliens deemed statutorily "inadmissable." *Clark v. Suarez Martinez*, 543 U.S. 371, 386 (2005).

Contrary to both the Petitioner's and Respondents' assertions, § 1231 is inapplicable to the instant matter. This is because the Court of Appeals has determined that an alien does not fall within § 1231's "removal period" until the occurrence of the latest statutorily-prescribed triggering event. *Leslie v. Attorney Gen. of U.S.*, ___ F. 3d ___ , 2012 WL 898614, at *4 (3d Cir. Mar. 19, 2012) (finding, pertinent to the matter *sub judice*, that "there can be little doubt that an alien, subject to and within a stay of removal, cannot yet be in the 'removal period' for § 1231 purposes."). Instead, when a removal order is on appeal, a petitioner is still "considered in 'pre-removal order' detention, and the protections afforded by *Clark . . .* do not yet apply to [his] situation." *Codina v. Chertoff*, Civ. Act. No. 06-105 (MLC), 2006 WL 2177673, at *2 (D.N.J. July 31, 2006). Therefore, as the reviewing court has not yet issued its final order, the authority to detain Bautista does not derive from § 1231.[3]

In his October 24, 2011 Order, Judge Munley correctly concluded that Bautista's detention was founded on 8 U.S.C. § 1225(b)(2)(A). *Bautista*, 2011 WL 5040894, at *3. Section 1225(b)(2)(A) applies where "the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." When a lawful permanent resident seeks to re-enter the United States, he will be considered an alien "seeking admission" if it appears that he has committed a crime involving moral turpitude.

---

[3] In addition to arguing that § 1231 guides Bautista's detention, the Respondents aver that Bautista is in an indefinite state of mandatory detention under § 1231 since the 90-day removal period has not yet begun to run as there has been no final order in his case. (Resp'ts' Br. at 6, Doc. 5.)

*Bautista*, 2011 WL 5040894, at *3 (citing *Tineo v. Ashcroft*, 350 F.3d 382, 390 (3d Cir.2003)).

Bautista admits, for the purposes of the instant motion, that he has been convicted of a crime

described within 8 U.S.C. § 1182(a), characterizing him an alien "seeking admission."[4]

(Pet'r's Br. at 17, Doc. 1.)   Thus, Bautista's confinement is properly evaluated in light of

§1225(b)(2)(A).

In *Diop v. ICE/Homeland Security*, 656 F.3d 221, 235 (3d Cir. 2011), the Court of

Appeals evaluated the case of a petitioner who was detained for almost three years under

8 U.S.C. § 1226(c), a similar provision providing for mandatory detention of aliens who have

also committed an offense covered by § 1182(a)(2).   Specifically, while § 1225(b)(2)(A)

requires detention of Lawful Permanent Residents seeking re-admission with records

indicating an offense enumerated within § 1182(a)(2), § 1226(c) requires detention of Lawful

Permanent Residents taken into custody directly following their sentence for the same list of

offenses.[5]   *See Nunez v. Elwood*, Civ. Act. No. 12-1488 (PGS), 2012 WL 1183701, at *3

---

[4]  Section 1101(a)(13)(C)(v) provides for this categorization, stating that "[a]n alien lawfully admitted for permanent residence in the United States shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien . . . has committed an offense identified in section 1182(a)(2) of this title . . . ." This includes crimes "involving moral turpitude."  *Id.* at § 1182(a)(2)(A)(i)(I).

[5]  In particular, 8 U.S.C. § 1226 ("Apprehension and detention of aliens") provides that "[t]he Attorney General shall take into custody any alien who . . . is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title."  8 U.S.C. § 1226(c)(1)(A).  This detention statute at issue in this matter, 8 U.S.C. § 1225(b)(2)(A) ("Inspection by immigration officers") provides for inspection of applications for admission and requires an alien to be detained where that alien "is not clearly and beyond a doubt entitled to be admitted."  As noted, a lawful permanent resident seeking reentry will be considered an alien "seeking admission" if he has committed a crime involving moral turpitude under 8 U.S.C. § 1182(a)(2).  However, for the purposes of analyzing indefinite detention, the Court finds no effective difference between these two provisions.  *See e.g. Alaka v. Elwood*, 225 F. Supp. 2d 547, 558-59 (E.D. Pa. 2002)

(continued...)

-6-

(D.N.J. Apr. 09, 2012) (defining "upon release").  In any event, *Diop* determined that, even though the statute seemingly dictated such custody, Congress could not have "intended to authorize prolonged, unreasonable, detention without a bond hearing." In particular, §1226(c) only:

> authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community.

*Id.* at 231.  Though an alien does not require an initial, individualized bond hearing, there will come a point at which the period of detention becomes "unconstitutional unless the Government has justified its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community." *Id.* at 232.  The length of this period is a "fact-dependent inquiry that will vary depending on individual circumstances." *Id.* at 233.  Moreover, because the Supreme Court suggested that the core purposes of such pre-removal detention would generally be achieved within one and one-half and up to five months depending on complexity, "the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past those thresholds." *Id.* at 234 (citing *Demore v. Hyung Joon Kim*, 538 U.S. 510, 530 (2003)).  As the petitioner in Diop had been detained for thirty-five months, his detention was deemed unreasonable and an individualized hearing was ordered.  *Id.*

---

[5](...continued)
(extending the Third Circuit's holding in *Patel v. Zemski*, 275 F.3d 299 (3d Cir. 2001), *overruled by Demore v. Hyung Joon Kim*, 538 U.S. 510, 516 (2003), requiring a bond hearing under § 1226(c) to also require a bond hearing in the § 1225 context as the distinction between the provisions "is of no consequence" and that § 1225 provides a stronger rationale for a bond hearing on its face).

Following *Diop*, Judge Conner ruled that a petitioner who had been detained for nearly twenty months under § 1226(c) while the merits of his removal bounced between the Immigration Judge and the Board of Immigration Appeals was entitled to release.  *Gupta v. Sabol, et at.*, Civ. Act. No. 1:11-cv-1081, 2011 WL 3897964, at *1 (M.D. Pa. Sept. 6, 2011). This decision was part of "a growing consensus within this district and throughout the federal courts[] that prolonged detention of aliens under § 1226(c) raises serious constitutional concerns."  *Id.* at *2 (citations omitted). Judge Conner further indicated that ICE had relied excessively on the mandatory nature of the detention provision, and that the petitioner was not himself responsible for the time consumed by the appeals process.  *Id.* at *3.  As such, that petitioner's detention was also unreasonable and he was ordered released.  *Id*; *see also Wilks v. U.S. Dept. of Homeland Sec.*, CIV. 1:CV-07-2171, 2008 WL 4820654, at *3 (M.D. Pa. Nov. 3, 2008) (finding a "prolonged detention" and granting a bond hearing to a petitioner detained under § 1226(c) "for about two and one-half years while his immigration proceedings have made their way through the agency and the court of appeals."); *but see Hernandez v. Sabol*, 823 F. Supp. 2d 266, 272 (M.D. Pa. 2011) (denying a habeas petition where the petitioner's detention under 8 U.S.C. § 1226(c) was, at seven months duration, not unreasonable).

Finally, although not binding on the Court, the Ninth Circuit has taken this growing consensus even further and has applied express limits to the exact sort of detention at issue in this case.  *Nadarajah v. Gonzales*, 443 F.3d 1069, 1078 (9th Cir. 2006).  Specifically, in light of the Supreme Court's holding in *Zadvydas*, the Ninth Circuit held that aliens detained under § 1225(b)(2)(A) may only be detained "while removal remains reasonably foreseeable," which is presumptively a six-month period.  *Id.* at 1078.  After that six-month period, or "'once

the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.'" *Id.* (quoting *Zadvydas*, 533 U.S. at 701.).

In light of the foregoing, the Court will grant Bautista's Habeas Petition insofar as he requests a bail hearing. While courts have declined to establish concrete rules for appropriate detention periods, there exists a point–somewhere around the seven-month mark–where pre-removal detention becomes universally questionable. Bautista's detention, today nearing twenty-six months, has exceeded by an order of magnitude even the tentative guidelines set by the Supreme Court in *Denmore*. While Bautista's mandatory detention is predicated on a different statutory provision than the mandatory provision cited in the above cases falling within this Circuit, the Court rejects the Respondents' notion that Bautista is owed no due process. And, like § 1226(c), there is no indication in this context that "Congress intended to authorize prolonged, unreasonable, detention without a bond hearing." *Diop*, 656 F.3d at 235. In fact, that parole may be granted to such aliens in mandatory detention "whose continued detention is not in the public interest," 8 C.F.R. § 212.5(b)(5), strongly suggests a lack of congressional intent to authorize unreasonable detention.

As a further matter, the Court is skeptical that Bautista's continued detention serves the public interest. According to Respondent's own statement, approximately five years had elapsed[6] between Bautista's latest conviction and his order to appear for a deferred

---

[6] Because of the delay between Bautista's completion of probation and his detention, if ICE had chosen to detain Bautista for his prior crimes while he was within the United States, he would have been detained under 8 U.S.C. § 1226(a), which does not require mandatory detention. It is an unfortunate consequence that because Bautista openly and voluntarily presented himself to the customs agent that he is now in mandatory
(continued...)

inspection. (Pet'r's Ex. D). And, since initially being intercepted at the airport, Bautista was allowed to remain free and at large until being finally directed to report. (*Id.*) This undermines Respondents' conclusory assertion that Bautista "poses a threat to society." (Reid Decl. at ¶ 4, Resp'ts' Ex. 6.) Conversely, Bautista represents that his detention has forced the sale of the family home, caused his lucrative business to go into bankruptcy, and has required that his family–including three young children–seek government assistance to make ends meet. (Pet'r's Br. at 15, Doc. 1.) Due process has been long overdue to Bautista, and the considerations listed above are among those properly considered at the bond hearing which he is entitled to.

## CONCLUSION

Bautista has been detained for almost twenty-six months without an individualized bond hearing. As this is in violation of the due process protections set out in *Diop v. ICE/Homeland Security*, 656 F.3d 221, 235 (3d Cir. 2011),[7] the Court will grant Bautista's habeas petition and order a bond hearing. An appropriate order follows.


 May 24, 2012                          /s/ A. Richard Caputo
Date                                  A. Richard Caputo
                                     United States District Judge


---

    [6](...continued)
detention. Yet, Bautista's honest reporting is a factor to be considered at his bond hearing.


    [7]  Because the Court will grant Bautista's Petition as a matter of due process, it is unnecessary to consider his arguments under the Eighth Amendment.